**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
RESIDENTIAL FENCES CORP. and
LASER INDUSTRIES INC.

                              Plaintiffs,                   14-CV-2552 (SIL)

RHINO BLADES INC., TOMER YUZARY,
and ANGELA YUZARY,                  **FINDINGS OF FACT &**
                                             <u>**CONCLUSIONS OF LAW**</u>

                              Defendants.

------------------------------------------------------------X
**STEVEN I. LOCKE, United States Magistrate Judge:**

The following constitutes of the Court's findings of fact and conclusions of law pursuant to a bench trial held on May 22, 23 and June 8, 2023. *See* DE [146-30, 146-31, 146-32] (citations to the trial transcript are to "Tr.").

## I.    FINDINGS OF FACT

As more fully described below, this case involves Plaintiffs' alleged accidental discovery of Defendants' overbilling them for certain products never delivered for a period of years resulting in substantial damages.

Plaintiff Residential Fences Corporation ("RFC"), formed in 1969, is a company that provides residential, commercial and industrial fencing services. Tr. 40, 42. Plaintiff Laser Industries, Inc., ("Laser"), formed in 1980 or 1984, is a subsidiary of RFC, and does on site civil construction work for roads, parks and other things. Tr. 40, 42, 124, 200. Throughout this litigation, the parties have treated RFC and Laser as a single entity, likely because they have operated as an integrated family business. During the relevant time period, the companies were owned and operated by five

brothers:  Mario Gulino, John Gulino, Joseph Gulino, Michael Gulino and Anthony Gulino.  Tr. 41.[1]  Prior to that, the business was operated by their parents.  Tr. 42.

Typically, Plaintiffs had between 150 and 200 employees at the height of their season, March to November, and sometimes as many as 250 if the company was especially busy.  Tr. 48, 78-79, *see* 222-23.  November to March was slower, largely because concrete cannot be poured below certain temperatures.  Tr. 47-48.

Prior to 2019, Mario Gulino had a yearly practice of conducting an inventory of equipment at Plaintiffs' warehouse in Ridge, New York.  Tr. 77, 80, 88.  The purpose of this practice was to look for unused stock that could be applied to other projects or resold.  *See* Tr. 88, 114-15, 117-18.  Once he discovered the extra equipment, he would also check the price and who purchased it.  Tr. 96, 115.

Part of Laser's business required the use of saws and blades to cut concrete, curbs, sidewalks and concrete pipes used for drainage.  Tr. 44, 45.  These blades came in various sizes, ranging from 14 inches to 36 inches.  *See* Tr. 44-45.  The smaller blades lasted two to three weeks and were used for quick cuts.  Tr. 45.  The 14-inch blades were used 64 percent of the time, and 16-inch blades 16 percent of the time.  Tr. 45, 47, 51, *accord* 287-88, 436.  The 26-inch blades for asphalt were used 15 percent of the time and the 26-inch blades for concrete were used 4 ½ percent of the time.  Tr. 69.  The 36-inch blades were used approximately ½ of one percent of the time.  Tr. 69.  These percentages were consistent during the time of the parties'

---

[1] At the time of trial, the two companies were owned by John, Michael and Joseph Gulino.  Tr. 200.

relationship and afterwards.  *Compare* Tr. 51 & 69 *with* 155.[2]  Typically, Laser had ten to 12 crews out on different projects at a time, each with its own saw.  Tr. 46.[3]

The way blade deliveries worked was that UPS would arrive at Plaintiffs' warehouse and an employee would receive and inspect what was delivered and obtain a check if the delivery was COD.  Tr. 77, 80.  In general, the employee receiving the package did not open the box, but instead set it aside for the person to whom it was addressed.  Tr. 81-85.  The packages of blades were generally addressed to Peter Garone, a 21-year Laser employee who was one of three superintendents and whose duties included being out in the field running jobs and ordering materials.  Tr. 48-49, 76, 85, 439-30.

During the time period from 2004 to 2013, Laser purchased saw blades from vendor Defendant Rhino Blades Inc. ("Rhino"), a Florida corporation and broker of these products formed in 2003 and ceasing operations in 2013 or 2014.  *See* Tr. 48, 86, 93, 230, 248, 319, 323-26 & D. Ex. 4 at RB000273-78.  Rhino was a one-man operation, with Defendant Tomer Yuzary ("Yuzary") in charge.  Tr. 249, 295-96.  He was the person who handled suppliers, prepared and shipped customer orders and managed all advertising, promotions and solicitations.  Tr. 254, 260-61 & P. Ex. 3, 4 (Interrogatory Resp. 7).  Defendant Angela Yuzary ("Angela"), Yuzary's ex-wife, was Rhino's nominal owner, and assisted with billing and writing company checks.  And

---

[2] The Court recognizes a discrepancy in the transcript concerning the percentage of 36-inch blades used, with one witness estimating 5 percent and another 0.5 percent.  The Court suspects this to be a transcriptional error rather than a difference in testimony as the 0.5 percent would allow the total percentages of the various blades to equal 100 percent.

[3] The Court acknowledges that a second witness testified that Laser used four to seven crews during peak season.  Tr. 430.  The Court accepts the 12-crew estimate as it was provided by one of Plaintiffs' owners, who is in a better position to know the companies' overall average workload.

although her name appears on shipping labels, she played no role in the company's daily operations, and more specifically, she never ordered blades for Rhino. Tr. 253, 279, 322. Although Yuzary testified that Angela earned all the money from Rhino and that he only received a salary of approximately $30,000 per year, the Court does not find this testimony to be credible. *See* Tr. 253. Rather, the Court concludes that Yuzary operated Rhino for his benefit as well as his ex-wife's.

The only evidence is that the blade ordering was not done pursuant to any specific protocol. Tr. 107-08. The parties' relationship started when Plaintiffs ordered blades in response to a promotion they received by fax. Tr. 430. Purchases were initially made by check for COD (collect-on-delivery) deliveries, and later by credit card—all without invoices. Tr. 125-26, 221-22, 264-65, 344. What had happened was that getting checks signed by one of the owners for COD deliveries became too cumbersome. Tr. 127. As a result, in 2006 or 2007 Plaintiffs gave Rhino a credit card number that Rhino could charge when making deliveries. Tr. 127. As a matter of practice, Garone was responsible for opening the packages of blades Defendants delivered. Tr. 85.

During the parties' relationship Plaintiffs made yearly payments to Defendants for blades in the following amounts: October 2004-September 2005-$12,821, all by check; October 2005-September 2006-$73,415, all by check; October 2006-September 2007-$40,045 by check, $44,158 by credit card for a total of $84,203; October 2007-September 2008-$74,057 by check, $72,029 by credit card for a total of $146,086; October 2008-September 2009-$35,248 by check, $211,236 by credit card

4

for a total of $246,484; October 2009-September 2010-$63,125 by check, $273,498 by credit card for a total of $336,623; October 2010-September 2011-$98,400 by check, $429,929 by credit card for a total of $528,329; October 2011-September 2012-$32,525 by check, $412,828 by credit card for a total of $445,353; October 2012-September 2013-$51,300 by check, $351,334.80 by credit card for a total of $402,634. Tr. 130-54 & P. Exs. 20, 20A, 21, 21A, 22A, 23, 23A, 24, 24A, 25, 25A, 26, 26A, 27, 27A, 28, 28A. The total amount of payments for the nine-year relationship is $390,300 by check and $1,795,013.68 by credit card for a total of $2,271,549.68.  Tr. 159 & P. Ex. 18.  At these numbers, Plaintiffs were Defendants biggest customers.  Tr. 251, 293, 315, 353.

During one of his yearly inventories in September 2013, Mario discovered an accumulation of Rhino Blades and wanted to see whether they could be used for later projects or resold.  Tr. 96-97.  In response to his inquiries, he was told that the blades at issue had been ordered by Garone from Yuzary. Tr. 48-49, 77, 81, 85, 342, 430 P. Ex. 7.  Their interactions were by phone or text and there are no documents corroborating the amount or type of blades for any order.  Tr. 342.  Prior to 2013, Plaintiffs never had an issue with Rhino's products, Tr. 75, there were never any complaints made to Defendants, and although Plaintiffs had a relationship with Rhino going back to the 2004, 2013 was the first year that Mario had noticed any accumulation of products, and started to investigate.  Tr. 97, 346.

Mario then learned from his staff (and the parties agree) that there were no invoices for any of the Rhino blades purchased.  Tr. 48, 274-75, 315, 360-61.[4]  As a

---

[4] According to Yuzary, he prepared and provided invoices only for customers who requested them.  Tr. 290-91, 296-97, P. Ex. 29.

result, Mario then followed up with a phone call to Yuzary to request purchase orders and invoices, to which Yuzary responded that all of the requests came verbally from Garone, and if Garone was unavailable Yuzary would ship blades based on estimates related to prior orders.  Tr. 49, 65, 270-71, 275.

Unsatisfied with this explanation, Mario followed up with email requests for the information.  Tr. 49, 52-64, P. Ex 7, 8 (email chain & attachment).  Mario then met with both individual Defendants, Tomar and Angela Yuzary, to address the situation.  Tr. 65.  After this in-person meeting, Plaintiffs stopped doing business with Defendants.  Tr. 66.  At no time did Mario ever get the documents he was seeking from Defendants concerning Plaintiffs' purchase history.  Tr. 70.

Suspecting that they had been cheated, Plaintiffs did more investigating. Keying in on the three years prior to the termination of the relationship, Laser paid Rhino Blades, $514,390 for the period 2010-2011, $458,467 for the period 2011-2012 and $422,654 for the period 2012-2013.  *See* Tr. 109-10 & P. Ex. 7 at 005.  This was an order of magnitude larger than billing in prior years and the years after severing ties with Defendants—between $40,000 and $63,000 per year paid to other vendors. Tr. 67, 111, 154, 208.  Then, relying on the price list provided by Defendants to Plaintiffs in late 2013 as part of their email exchange when Mario was expressing concerns about Plaintiffs' dealings with Rhino, *see* P. Ex 8, Plaintiffs deduced that in order for their payments to be based on genuine deliveries, they would have had to have received impossible numbers of blades that their business would have never used, *e.g.*, 1,699 14-inch blades from October 2010-September 2011, 1,432 14-inch

blades for October 2011-September 2012 and 1,295 14-inch blades from October 2012-September 2013.  *See* Tr. 159-65, P. Ex. 19.

In reaching these conclusions of fact the Court expressly rejects Yuzary's version of events as patently incredible.  Yuzary started operating Rhino after serving a period of incarceration following his guilty plea to conspiracy to commit securities fraud and wire fraud and 13 counts of securities fraud.  Tr. 231, 234-45 & P. Exs. 11, 13.  At trial, he conveniently was unable to recall whether he has been making court-ordered restitution once his post-incarceration supervision concluded.  Tr. 252.  As the person in charge of Rhino, Yuzary charged Plaintiffs, his biggest customer, between $700 and $1000 per blade due, purportedly to market fluctuations, Tr. 289, 305, 331-33, but was unable to provide a single document corroborating this claim. Tr. 393.  Yet examples of invoices provided to other customers showed prices between $17.75 and $179 per blade in 2009 and 2010.  Tr. 296-304, 307-08, 337-39, P. Ex. 29 at RB000379, RB000384, RB000388, RB000390, RB000391, RB000393, RB000396, D Ex. 12 at RN00043, D. Ex. 4 at RB000069-73.  None of the invoices to other customers showed a price of over $200 for a 14-inch blade.

As to the price list that Yuzary provided to Mario as part of their September 2013 email correspondence, listing, for example, the price of at 14-inch all-purpose blade at $199, he claims that this price was a proposal going forward, and did not represent prices for prior sales.  *See* Tr. 282 & P. Ex. 8.  He makes this assertion despite the fact that the accompanying email chain says nothing of the sort, instead speculating with no support or corroboration whatsoever that the emails were

7

altered, despite the fact that he was a party to the email chain and likely could have produced an original himself. *See* Tr. 283-85 (a portion of the email chain is "conveniently missing" and was "deleted").

Nevertheless, to further support the amount of the payments made, Yuzary testified that Garone had told him that business was increasing and so the number of blades delivered also increased. Tr. 349, 398. Garone denies ever speaking with Yuzary about future business and stated credibly that to his knowledge Plaintiffs' business never increased substantially, or at least the demand for more workers never did. Tr. 439, 441. Further, such information would have been beyond Garone's job responsibilities as a superintendent. Tr. 435. Garone further denied that he ever told Yuzary that Rhino could just send blades based on estimations. Tr. 437. With respect to pricing, Garone testified, again credibly, that his current employer pays between $125 and $135 for 14-inch blades. Tr. 442.

As to records of what Yuzary sent Plaintiffs, he claims that he used to have records in Quickbooks on a desktop, which he never backed up, despite Quickbooks offering cloud-based services, and the data was lost during Super Storm Sandy, which occurred in October 2012 because his computer was kept in a basement that was impacted. Tr. 266-67. As a result, he could not produce these records. As to records for the time period from October 2012 to September 2013, while the parties were still doing business together, Yuzary states that he had no records because he was involved in another business. Tr. 269-70.

At one point, although Yuzary testified that he had copies of documentary evidence supporting his assertion that he sent tens of thousands if not hundreds of thousands of dollars worth of equipment and blades, Tr. 286, he produced none of these documents.  In addition to producing no invoices, he produced no related documents, such as checks to Rhino's vendors, the manufacturers or wholesalers of blades that were eventually sent to Plaintiffs.  Tr. 271-75.  And although he could have asked these vendors for invoices that would support his position, he never did. Tr. 258-59, 262-63, P. Exs. 3,4 (Interrogatory Resp. 3 identifying Rhino's vendors who supplied Rhino the blades Rhino sold to Plaintiffs but no documents reflecting transactions between these suppliers and Rhino were ever produced).

On other topics, Yuzary gave inconsistent testimony. For example, he testified that he personally boxed all the blades he sent to protect his customer information in a cutthroat industry.  Tr. 364.  Yet he also testified that he had his vendors, the blade manufacturers, send blades directly to Rhino's customers, Tr. 359, which would necessarily require providing the contact information for his customers and product requirements.[5]

---

[5] Finally, the Court notes that Yuzary made a number of other uncorroborated accusations that other witnesses denied, but that are irrelevant in any event.  Yuzary claims that in 2013 Garone threatened him physically and that the Gulinos would do whatever they need to in order to get their money back. Tr. 372.  Garone denied that this happened.  Tr. 442.  Whether it happened however, does not inform the Court's decision as to whether Defendants unlawfully took money from Plaintiffs.  Additionally, Yuzary claims that he sent blades to Garone's home because Garone told him that he was not receiving blades sent to the warehouse. Tr. 350-51.  Garone denied this.  Tr. 437.  There was some documentary evidence that two unidentified UPS deliveries from Rhino were sent to Garone's home, but even if this occurred, it does not weigh in either side's favor on this issue of overbilling for blades that were never sent, especially where the contents of the packages were not verified and Garone recalled receiving a baby gift at home from Yuzary when his (Garone's) son was born.  *See* Tr. 443, 446, 451-52, D Ex. 16 at RB000255, RB000257.

Based on the above, Plaintiffs are seeking $1,501,110.68 in damages. Tr. 204. This number is based on taking the amount Rhino charged prior to the overcharges, *i.e.*, $73,000, *see* Tr. 206 & P. Ex. 18, and rounding up to $100,000 as the highest amount Plaintiffs could have possibly paid in a given year for blades, and then deducting $100,000 per year from the years, October 2007 through September 2013. Tr. 206-07. Taking the sum of these overcharges yields a total of $1,501,000 in damages. Tr. 206-07.

## II.   CONCLUSIONS OF LAW

Although the Complaint in this case asserts five causes of action, Plaintiffs only press three in their post-hearing briefing: (1) fraud; (2) conversion; and (3) unjust enrichment. The Court addresses each in turn.[6]

### A. <u>Fraud</u>

Under New York law, to establish a fraud cause of action, a plaintiff must prove that the defendant made a material misrepresentation or omission of fact knowing it to be false with the intent to produce reliance, and that the plaintiff relied on the misrepresentation or omission causing the plaintiff damages. *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496

---

[6] New York law applies to Plaintiffs' claims. *See Burns v. Delaware Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 27 n.4 (S.D.N.Y. 2010) (noting New York courts apply law of the state with the greatest interest in the litigation to unjust enrichment claims); *Winstead v. Phillocraft Inc.*, 03-cv-3813, 2005 WL 2001902, at *5 n.2 (S.D.N.Y. Aug. 19, 2005) (citing *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996)) (quoting *Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922 (1993)) (Under New York law, regarding a tort, "'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.'"). Moreover, the Court notes that both parties assume New York law applies in their post-trial briefing. *See Henneberry v. Sumitomo Corp. of Am.*, No. 04-civ-2128, 2005 WL 991772, at *5, n. 3 (S.D.N.Y. Apr. 27, 2005) ("Where the parties so assume, the Court need not address choice of law *sua sponte*.").

(2d Cir. 2009).  "Each element of the fraud claim must be shown by clear and convincing evidence . . . at trial." *Id.*  Moreover, to establish a fraud claim "the circumstances constituting fraud must be stated with particularity." *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 263 (E.D.N.Y. 2011) (citing Fed. R. Civ. P. 9(b)). To satisfy the particularity requirement, the plaintiff must:  "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

Applying these standards, the fraud claim fails.  Plaintiffs have not submitted evidence of any specific misrepresentation made by Defendants with any particularity.  With respect to the blades delivered COD, Plaintiffs argue that the dollar amounts listed on the labels, which requested payment in certain amounts, were misrepresentations because such amounts were not actually owed.  *See* Plaintiffs' Post-Trial Reply Brief ("Reply"), DE [147], at 3.  As to the blades purchased via credit card, Plaintiffs claim that Defendants misrepresented the amount owed when charging Plaintiffs' Amex card.  *See id.* at 3-4.  Plaintiffs do not, however, point to any specific statement(s) or establish why each such statement was fraudulent. *See Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir. 1991) (affirming district court judgment rejecting fraud claim where plaintiff failed to prove that defendant made a false representation); *Pues Fam. Tr. IRA by Pues v. Parnas Holdings Inc.*, No. 11-CV-5537, 2015 WL 13375030, at *21 (E.D.N.Y. Oct. 20, 2015),

*aff'd sub nom. Pues Fam. Tr. Ira v. Parnas Holdings Inc.*, 677 F. App'x 4 (2d Cir. 2017) (dismissing fraud claim after trial where plaintiff failed to prove defendant made a misrepresentation); *Ez-Tixz, Inc. v. Hit-Tix*, 969 F. Supp. 220, 226 (S.D.N.Y. 1997) (concluding after trial that defendants failed to prove counterclaim for fraud where they failed to introduce evidence of a misrepresentation).  As a result, Plaintiffs have not established that they were victims of fraud, and the cause of action is rejected.[7]

### B. Conversion

In New York, "[c]onversion  is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347 (1995) (quoting *Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105, 156 N.E. 629, 630 (1927)).  To establish a claim, a plaintiff must prove: "'(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the property, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Ultra Dairy LLC v. Kondrat*, 514 F. Supp. 3d 452, 459 (N.D.N.Y. 2021) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)) (internal alterations omitted).  A cause of action for conversion of money will only lie "'where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in

---

[7] Plaintiffs' alternative argument, that the omission of invoices in each package of blades amounts to fraud, is of no moment.  *See* Reply at 4.  The general omission of invoices over a period of seven years does not amount to a specific misrepresentation.

question.'" *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 207 A.D.3d 136, 139, 171 N.Y.S.3d 44, 46 (1st Dept 2022) (quoting *Manufacturers Hanover Trust Co. v Chemical Bank*, 160 AD2d 113, 124 (1st Dept 1990)). "Accordingly, 'conversion occurs when funds designated for a particular purpose are used for an unauthorized purpose.'" *East Schodack Fire Co., Inc. v. Milkewicz,* 140 A.D.3d 1255, 1256, 34 N.Y.S.3d 640, 642 (3d Dep't 2016) (quoting *Lemle v. Lemle,* 92 A.D.3d 494, 497, 939 N.Y.S.2d 15, 18 (2012)).

Here, Plaintiffs' conversion cause of action also fails.  The property Plaintiffs allege was converted are the funds paid for the blades in excess of their actual value.  *See* Reply at 5-7.  Plaintiffs have not shown however, that the money paid to Defendants was "a specific, identifiable fund," such that a conversion claim can lie.  *Fam. Health Mgmt, LLC,* 207 A.D.3d at 139, 171 N.Y.S.3d at 46; *see Schroeder v. Cap. One Fin. Corp.,* 665 F. Supp. 2d 219, 225 (E.D.N.Y. 2009) (concluding conversion claim fails on summary judgment where plaintiff could not show funds were specifically identifiable); *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991) (same).  There is no evidence that the money – whether paid by check or credit card – originated from a specific fund designated for a particular purpose.  Moreover, Plaintiffs do not seek the recovery of a specific amount of money, but rather an estimation of the amount they were overcharged for blades based on their past purchase history.  As a result, while a conversion claim may appear to be intuitive under these circumstances, Plaintiffs' claim cannot be sustained.  *Compare Schroeder,* 665 F. Supp. 2d at 225 (dismissing conversion claim for unspecified funds),

13

*with Fam. Health Mgmt., LLC,* 207 A.D.3d at 148, 171 N.Y.S.3d at 52 (entering judgment in favor of plaintiff on claim for conversion of money where defendant converted a check for a specific amount).

## C. Unjust Enrichment

The doctrine of unjust enrichment – which has its origins in both common law and equity – has been defined as "any unequal transfer of value without an adequate legal basis." *Chapter One the Intellectual History of Unjust Enrichment*, 133 HARV. L. REV. 2077 (2020). To that end, "[a] person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011); *see IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 361 (2009) (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)) ("An unjust enrichment claim 'rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'"). Under New York law, to prove a claim for unjust enrichment, a plaintiff must show: "(1) 'that the defendant was enriched at the plaintiff's expense' and (2) 'that equity and good conscience require the plaintiff to recover the enrichment from the defendant.'" *Speedfit LLC v. Woodway USA, Inc.,* 53 F. Supp. 3d 561, 579–80 (E.D.N.Y. 2014) (quoting *Giordano v. Thomson,* 564 F.3d 163, 170 (2d Cir. 2009)). Unjust enrichment "is not a catchall cause of action to be used when others fail," but rather is available where "though the defendant has not breached a contract nor committed a recognized tort, circumstances create an

14

equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 740 (2012).

Here, the credible evidence establishes that Rhino was unjustly enriched at Plaintiffs' expense.  Between 2007 and 2013, Plaintiffs paid Rhino significantly more per year for blades than in prior or subsequent years after severing ties with Defendants, while experiencing no increase in work.  *See* Tr. 67, 109-11, 154, 208, 439, 441 & P. Ex. 7 at 005.  From October 2004 to September 2005, Plaintiffs paid Rhino $73,415 for blades, but from 2010 to 2011, Plaintiffs paid $528,329.  *See* P. Exs. 21A & 26A.  Based on the price list provided by Yuzary in late 2013, in order for these payments to have been based on actual deliveries, Plaintiffs would have had to have received an increased number of blades, more than their business would ever and could ever have used.  *See* Tr. 159-65.  The only logical explanation is that Plaintiffs were overcharged for the blades they received.  Under these circumstances, unjust enrichment is an appropriate remedy, given that there is no contract governing the transactions at issue, and as described above, Defendants' actions also do not to amount to a recognized tort.  *See* Sections II.A & B, *supra*; *Corsello*, 18 N.Y.3d at 790, 944 N.Y.S.2d at 740.

Moreover, Yuzary's explanations for the overbilling are incredible to the point where no reasonable fact finder could adopt them.  Yuzary claimed to have charged Plaintiffs between $700 and $1000 per blade, while invoices provided to other Rhino customers show prices between $17.75 and $179 per blade.  *See* Tr. 296-304, 305-08, 337-39.  Yuzary further testified that he sent Plaintiffs more blades based on Garone's

statements that Plaintiffs' business was increasing, but this assertion was directly and credibly contradicted by Garone, and there was no other evidence supporting Defendants' testimony. *See* Tr. 349, 398, 435, 437, 439, 441. These explanations, as well as Yuzary's purported reasons for not producing records in support of his version of events, are rejected. As a result, the Court concludes that Rhino was unjustly enriched in the amount that it overcharged Plaintiffs for the blades delivered. *See Marini v. Adamo,* 995 F. Supp. 2d 155, 203 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016), and *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (finding plaintiffs established unjust enrichment claim at trial where defendant's actions caused plaintiffs to pay artificially inflated prices). Further, equity and good conscience require that Rhino repay the amount it was enriched. *See id.*

### D. Individual Defendants' Liability

Having determined that Rhino was unjustly enriched, the Court must determine whether Defendants Yuzary and Angela are also individually liable under the same theory. With respect to Yuzary, the Court concludes that he is personally liable. As a corporate officer, regardless of his nominal role in the corporation, he may be held liable for unjust enrichment if he was personally enriched at the plaintiffs' expense. *See Bradkin v. Leverton,* 26 N.Y.2d 192, 199, 309 N.Y.S.2d 192, 198 (1970)) (finding corporate officers could be liable for unjust enrichment where they allegedly personally benefited at plaintiff's expense); *Georgia Malone & Co., Inc. v. Ralph Rieder,* 86 A.D.3d 406, 408-09, 926 N.Y.S.2d 494, 497 (1st Dep't 2011) (same).

16

Here, the credible evidence establishes that Yuzary directly benefited from the overcharging scheme.  Although Yuzary testified that he was not an owner of Rhino and was merely an employee, *see* Tr. 230, 253, the Court rejects this testimony as unconvincing.  According to his own statements, Yuzary was solely responsible for Rhino's daily operations, including purchases from suppliers and shipments of customer orders, as well as advertising, promotion and solicitation.  *See* Tr. 254, 260-61 & P. Ex. 3, 4.  He also managed the relationship between Rhino and Plaintiffs, communicated with Garone regarding requested shipments, charged Plaintiffs' credit card to facilitate purchases, and personally shipped the blades to Plaintiffs based on his estimates related to prior orders.  *See* Tr. 49, 65, 127, 270-71, 275.  The assertion that Yuzary only earned a $30,000 annual salary from Rhino is patently implausible – given his near-total control of Rhino's operations and the fact that the rest of the profits were given to his ex-wife – and in any event, does not allow him to escape liability.  *See* Tr. 253.  Although Angela, Yuzary's wife during the relevant time period, was the formal owner of the corporation, the credible evidence demonstrates that Yuzary was operating Rhino for his personal gain.  In fact, everything Yuzary did with respect to Rhino was for his own benefit, including attempting to shield himself from liability via the corporate form.  Accordingly, Yuzary benefited from the overcharging scheme and was therefore unjustly enriched at Plaintiffs' expense.[8]

---

[8] As the finder of fact, the Court is free to reject all of Yuzary's testimony if it concludes that he lied about anything.  *See United States v. Flores*, No. S5-15-CR-765, 2017 WL 1133430, at *3 (S.D.N.Y. Mar. 24, 2017), *aff'd*, 945 F.3d 687 (2d Cir. 2019) (noting jury was properly instructed that where witness lied, they were free to reject all or any part of his testimony).  The Court invokes this rule here and rejects all of Yuzary's testimony suggesting that he did not sufficiently benefit from Rhino's operations to hold him personally liable.

Further, Defendants' argument that Angela is not liable to Plaintiffs because she did not commit any of the acts underlying Plaintiffs' claims is of no moment.  To be found liable for unjust enrichment, the party enriched need not "take an active role in obtaining the benefit." *Aetna Cas. & Sur. Co. v. LFO Const. Corp.*, 207 A.D.2d 274, 277, 615 N.Y.S.2d 389, 391 (1st Dep't 1994).  A party may be held liable for unjust enrichment, even where she engaged in no wrongdoing, if she was enriched at the expense of another.  *See Corsello,* 18 N.Y.3d at 790, 944 N.Y.S.2d at 740 (noting that unjust enrichment claims are available where defendant "though guilty of no wrongdoing, has received money to which he or she is not entitled").  Here, Angela was the owner of Rhino, and although she did not directly participate in the overcharging practices, the only testimony was that she was nonetheless enriched through her receipt of the company's revenue. *See* Tr. 253, 279, 322.  Equity and good conscience do not permit Angela to retain the funds she acquired at Plaintiffs' expense.  *See Marini,* 995 F. Supp. 2d at 204-06 (finding fraudster's wife liable for unjust enrichment where she benefited from the underlying scheme despite not personally participating).  Accordingly, Angela is also liable to Plaintiffs for unjust enrichment.

### E. **Damages**

#### 1. Damages for Unjust Enrichment

The Court next turns to a calculation of Plaintiffs' damages.  Plaintiffs seek damages for the period from October 2007 to September 2013. *See* Tr. 206-07.  With respect to damages, "[e]nrichment from a money payment is measured by the amount

of the payment or the resulting increase in the defendant's net assets, whichever is less." Restatement (Third) of Restitution and Unjust Enrichment § 49(2) (2011); *see Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011) ("It is well-settled that the measure of damages for an unjust enrichment claim is restricted to the 'reasonable value' of the benefit conferred upon the defendants.").

To that end, the Court's best estimate of Plaintiffs' damages is $1,755,350.50. This amount was calculated by examining Plaintiffs' blade expenditures immediately prior and subsequent to the period at issue. In the three prior years – October 2004 to September 2007, Plaintiffs spent $12,821, $73,415 and $84,203 on Defendants' blades respectively. *See* P. Exs. 20A, 21A & 22A. After Plaintiffs terminated their relationship with Defendants, Plaintiffs spent a maximum of $63,000 on blades per year. *See* Tr. 67, 111, 154, 208. Averaging these four figures together yields an average blade expenditure of $58,359.75 per year. Subtracting this value from the amounts that Plaintiffs paid Defendants each year from October 2007 to September 2013 and totaling those amounts results in $1,755,350.50 in total overcharges.

Plaintiffs, however, calculated their damages based on the assumption that they could have paid up to $100,000 per year for blades. *See* Tr. 206-07. Deducting $100,000 from the totals Plaintiffs paid Defendants each year in the relevant period and totaling those amounts results in $1,501,110.68 in total overcharges. Although this calculation results in less damages than the Court's estimation, the Court holds

19

Plaintiffs to their argument.  Accordingly, Plaintiffs are awarded $1,501,110.68 in damages.

### 2.  Pre-Judgment Interest

Moreover, Plaintiffs are entitled to pre-judgment interest under NY CPLR § 5001.  In a diversity action, the Court applies New York law to determine whether to award pre-judgment interest.  *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.") (internal quotation marks, citation and alterations omitted).  Pre-judgment interest pursuant to § 5001 is mandatory on equitable claims such as unjust enrichment where the underlying relief awarded is legal in nature, *i.e.,* monetary damages.  *See Stillman v. InService America Inc.,* 738 F. Supp. 2d 480, 482-83 (S.D.N.Y. 2010) (citing *Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 508 (2d Cir. 1992)) (awarding pre-judgment interest pursuant to NY CPLR § 5001 on a *quantum meruit* claim).  Given that Plaintiffs were awarded monetary damages on their unjust enrichment claim, pre-judgment interest is mandatory.

Under § 5001(b), pre-judgment interest accrues at an annual rate of 9% and is to be "computed from the earliest ascertainable date."  NY CPLR §§ 5001(b), 5004.  When damages are incurred at various times, each item's interest is computed individually from the date it was incurred, or all of the damages are computed from a reasonable intermediate date.  *See Kirton v. Northwestern Mut. Life Ins. Co.*, No. 00–cv–7646, 2006 WL 3051772, at *1–6 (E.D.N.Y. Oct. 24, 2006); *see Conway v. Icahn*

*& Co., Inc.*, 15 F.3d 504, 512 (2d Cir. 1994) ("[S]ection 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest.").

During the relevant period, Plaintiffs made their first payment to Rhino on October 1, 2007 and their last payment on September 13, 2013.  P. Exs. 23A & 28A. The midpoint between these two dates is September 22, 2010, which the Court considers to be a reasonable intermediate date from which to calculate pre-judgment interest.  *See Manzo v. Sovereign Motor Cars, Ltd.,* No. 08-CV-1229, 2010 WL 1930237, at *12 (E.D.N.Y. May 11, 2010), *aff'd*, 419 F. App'x 102 (2d Cir. 2011) (utilizing midpoint date to calculate pre-judgment interest where plaintiff's damages accrued over a period of time).  Applying New York's 9% per annum interest rate to the amount of damages awarded ($1,501,110.68), the Court awards $1,818,818.82 in pre-judgment interest, which is calculated through the date of this Order, and $370.13 per day thereafter until judgment is entered.[9]

### 3.  Post-Judgment Interest

With respect to post-judgment interest, federal law controls.  The interest rate set forth in 28 U.S.C. § 1961 "applies to '*any* money judgment in a civil case recovered in a district court' . . . and it makes no exception for judgments rendered in diversity actions." *Cappiello v. ICD Publications, Inc.,* 720 F.3d 109, 113 (2d Cir. 2013) (quoting 28 U.S.C. § 1961) (emphasis in original); *see Axos Bank v. Ottomanelli,* No. 23-CV-

---

[9] This figure was reached by taking the number of days between the midpoint, September 22, 2010, and today's date, March 6, 2024 (4,914 days) and multiplying it by the daily interest rate of $370.13 ($1,501,110.68 (unjust enrichment damages) x 0.09 (yearly interest) = $135,099.96 / 365 days = $370.13 per day interest).

00941, 2023 WL 8567503, at *4 (E.D.N.Y. Dec. 11, 2023) (awarding post-judgment interest based on 28 U.S.C. § 1961 in a diversity action asserting state claims). Accordingly, Plaintiffs are awarded post-judgment interest consistent with § 1961.[10]

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' fraud and conversion claims are dismissed with prejudice.  With respect to Plaintiffs' unjust enrichment claim, the Court directs judgment be entered after trial in Plaintiffs' favor against Defendants Rhino Blades Inc., Tomer Yuzary and Angela Yuzary in the amount of $1,501,110.68, plus $1,818,818.82 in pre-judgment interest, for a total of $3,319,929.50, as well as $370.13 in pre-judgment interest per day until judgment is entered, and post-judgment interest at the rate provided for in 28 U.S.C. § 1961.


Dated:        Central Islip, New York
              March 6, 2024

                                   s/ Steven I. Locke
                                   STEVEN I. LOCKE
                                   United States Magistrate Judge

---

[10] The Court notes that neither party took a position on the bases or amounts of pre- or post-judgment interest, and Plaintiffs simply seek "applicable statutory interest" in their post-hearing briefing.  Reply at 10.

22